IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MARCEL DARON KING,<br><br>Defendant.<br>_____ / | No. C 10-00455 WHA<br><br>**ORDER DENYING<br>MOTION TO SUPPRESS** |

### INTRODUCTION

Based on *Seibert v. Missouri*, 542 U.S. 600 (2004), defendant moves to suppress any confessions by him to police on a visit to the stationhouse. The motion is **DENIED**.

### STATEMENT

The following background facts are drawn from declarations and the video-recording filed with briefing on the motion. On May 10, 2010, San Francisco Police Department inspectors were investigating a homicide. They got a tip that Marcel King, defendant herein, may have committed it. Mr. King was on felony probation at the time, so the police had an address for him and went to that address. It was his grandmother's house. He was not at home. His grandmother said to police that he "typically" resided at his mother's house, so the police inspectors went there. Again, Mr. King was not at home. His mother took the inspectors to a room that she indicated was his room. She also said she had permission from him to enter the room. With her permission, the inspectors searched the room. They found a shotgun under the bed.

While the police were still at the mother's house, he called her. She told him that the police were there. One of the police inspectors, Inspector Engler, then spoke to Mr. King. Inspector Engler informed King that the police had searched "his" room. Inspector Engler did not tell King that they found a shotgun under the bed, but apparently King knew, presumably because his mother told him or because a search would usually have found a shotgun under the bed (*see* Dkt. No. 29). King said he would come speak with police about the homicide. He met Inspectors Engler and Cunningham at a McDonald's next to 850 Bryant Street, a main police building. The inspectors brought Mr. King into 850 Bryant in handcuffs and through a private entrance. In an interrogation room, the handcuffs were removed and he spoke to police about what he knew about the circumstances surrounding the homicide. Well into the interview and long after the *Miranda* warning was given, they also spoke about the shotgun that the inspectors found under the bed at King's mother's house. King admitted that he had a shotgun in his room at his mother's house, under the bed. They continued to discuss the circumstances under which Mr. King got the gun, and he dictated and signed a written confession about his possession of it. At the end of the interview, Mr. King was taken into custody and charged with being a felon in possession of a firearm. Other facts are below. Although the incriminating statements were made after the *Miranda* warning, the motion is based on pre-warning conduct in the interview that supposedly tainted the later admissions.

**ANALYSIS**

Defendant basis his motion on the decision of *Missouri v. Seibert*, which held: "[b]ecause [a] midstream recitation of warnings after interrogation and unwarned confession could not effectively comply with *Miranda*'s constitutional requirement, [] a statement repeated after a warning in such circumstances is inadmissible." 542 U.S. at 617. The court of appeals has since had occasion to apply this prohibition against deliberate two-step police interrogation. *See United States v. Williams*, 435 F.3d 1148 (9th Cir. 2006); *Thompson v. Runnel*, — F.3d —, 2010 WL 3489837 (9th Cir. 2010).

Defendant's argument comes down to the following: defendant made incriminating statements before he was advised of his *Miranda* rights — the content of which he later

confirmed after being given *Miranda* warnings — and that this was a deliberate two-step interrogation warranting suppression of all statements both before and after the *Miranda* warnings. This is a vast exaggeration of what actually happened, as shown by the video of the interview.

After defendant arrived in the interview room and was uncuffed, the following occurred (with italics for the key passage emphasized by defense counsel):

| | |
|---|---|
| King: | You [] want a statement from me? |
| Inspector Engler: | He's got a written statement for you for later. |
| King: | Who's these people that say all this stuff? |
| Inspector Engler: | We're gonna go into that. |
| Inspector Cunningham: | Who told you that? Clearly we've got problems that we're going to go — we're gonna— |
| King: | Y'all gonna see. I [inaudible]. |
| Inspector Engler: | Let's do this real quick. The first thing I want to cover is this. Okay. You came down here — how come? 'Cause we talked to you on the phone and asked you if you'd come down to voluntarily talk to us at the Hall of Justice? I didn't force you to come down here, is that true? |
| King: | No, no. You didn't force me; I wanted to come in 'cause I wanted to know what's going on. |
| Inspector Engler: | Right, so, I'm gonna take a statement from you. What we do at the beginning of the statement is we always cover like what time it is, who's talking, and the circumstances of why you're here. So the time is — what's today? Today's May 9th — |
| Inspector Cunningham: | Today's the 10th. |
| Inspector Engler: | Is it? Okay, [inaudible] May 10th, 2010, and the time is 11:55 in the morning. And my name's Inspector Joe Engler, and my star is 239 and my partner — |
| Inspector Cunningham: | [inaudible] 650. |
| King: | My name is Marcel King. |

3

| | | |
|---|---|---|
| 1 | Inspector Engler: | Marcel King, and, Marcel, what's your birthday? |
| 2 | King: | Three, thirteen, 87. |
| 3 | Inspector Engler: | Okay, and Marcel, you've had a couple of places you've stayed. Where do you sleep at night? |
| 4 | | |
| 5 | King: | I sleep with my girl. |
| 6 | Inspector Engler: | Where's that? |
| 7 | King: | That's on Harbor. |
| 8 | Inspector Engler: | What's the address over there? |
| 9 | King: | 277. |
| 10 | Inspector Engler: | 277 Harbor. And who's your girl? |
| 11 | King: | Her name is Ashley Aimes [phoenetic]. |
| 12 | Inspector Engler: | Alright, and you guys have a baby together? |
| 13 | King: | Yeah. |
| 14 | Inspector Engler: | And that's Marcel Junior. |
| 15 | King: | Yes. |
| 16 | Inspector Engler: | Okay. So earlier we did a couple things. Another place that you lived was your mom's place. |
| 17 | | |
| 18 | King: | Mm-hmm. |
| 19 | Inspector Engler: | *Okay, and in the downstairs, your mom pointed out there's a bedroom there and a bedroom there and you stay in there when you're around and your brother stays in the other room when he's around.* |
| 20 | | |
| 21 | | |
| 22 | King: | *Mm-hmm.* |
| 23 | Inspector Engler: | So I just want to cover that with you. And then there's another place that we went, and that's where you were raised, your grandmother's place. |
| 24 | | |
| 25 | | |
| 26 | King: | Yeah. |
| 27 | Inspector Engler: | And that's at 1526 Hudson. |
| 28 | King: | Yeah. |

| | | |
|---|---|---|
| 1 | Inspector Engler: | Okay, so, I just — I want you to know all the things we're going to talk about. We're going to talk about the three places that you sleep. Okay. We're going to talk to you about things that are being said about you. |
| 4 | King: | Yes. |
| 5 | Inspector Engler: | Okay, and you came here voluntarily; we already covered that. |
| 6 | King: | Yes. |
| 7 | Inspector Engler: | Okay, and at this time you're not under arrest. |
| 9 | King: | Yes. |
| 10 | Inspector Engler: | Okay, you're free to talk to us; you're free to not talk to us. But we brought you up in a pair of handcuffs through the police elevators, is that correct? |
| 12 | King: | Yes. |
| 13 | Inspector Engler: | Alright, so because we did that, I got to Mirandize you, but, again, you have your rights and I'm not gonna force you to say anything. |
| 16 | King: | I'll talk. I'll say anything y'all wanna know. |
| 17 | Inspector Engler: | Alright, so let me pull out my *Miranda* card, because we're in a police facility and we brought you up in the police elevator in a pair of handcuffs [inaudible], so you have the right to remain silent . . . |

Thereafter, Inspector Engler proceeded to read the defendant his rights, pausing after each right to ask the defendant if he understood that right. For each, Mr. King said that he did. Then he and the inspectors discussed what he knew about the circumstances surrounding the homicide. After about an hour and a half of discussion about the homicide, they discussed King's possession of the shotgun found under the bed at his mother's house. This discussion began with the following:

| | | |
|---|---|---|
| 25 | Inspector Engler: | You say you haven't shot a gun since 2000, but what's up with the shotgun under your bed? |
| 27 | King: | Oh, I mean, that was there, but, I mean, I ain't shot it or nothin'. |
| 28 | Inpsector Engler: | Okay. |

United States District Court
For the Northern District of California

> King: It was there, I mean, just for looks. It be there just to brag about. . . .

They discussed the shotgun for about fifteen minutes, at the end of which King dictated and signed a written confession. Inspector Engler read the content of the written confession on the video, and the following is a best approximation of what it said:

> In approximately March 2010, toward the end of March, I got a gun from Ted. I always wanted it, because of the way it looked. He gave it to me and said, "It's yours, keep it." He had another one. There are no bullets in it. He said that he wouldn't give me bullets until we went hunting. I know he wanted it back, but he was just letting me keep it anyway. I brought it home and threw it under the bed. My bed is at 78 Edgar Place in the basement.

Then King continued to discuss the circumstances surrounding the homicide with police. The duration of the whole video is about five and a half hours.

**1.    NO NEED FOR AN EVIDENTIARY HEARING**

Mr. King stated under oath: "upon arriving at the police station, the officers placed me in handcuffs and took me into custody . . . Once I was placed in handcuffs, the officers took me into an elevator and then up to an interrogation room. As soon as I was taken into custody, the officers started asking me . . . [reviewed what occurred in the interrogation room]." Inspector Engler stated under oath (emphasis added):

> Myself and Inspector Daniel Cunningham then went to the McDonald's and met with Mr. King. Mr. King stated that he was willing to go to the Hall of Justice for an interview. I informed Mr. King that we would be taking him in through the private SFPD basement and the private elevator to the interview location. We placed Mr. King in handcuffs when going from the McDonald's to the interview room. I informed Mr. King that was due to protocol for civilians in SFPD areas of the building. To my mind, Mr. King was, at that time, a probationer from a conviction of a crime of violence and a suspect in a homicide investigation who I had not searched, who I was bringing into SFPD areas of the building which did not require persons to pass through a metal detector. The front entrance to 850 Bryant Street is typically a very crowded area with numerous individuals involved in alleged or proven criminal activity in front of the building, waiting in long lines at the security clearance in the front of the building, and in the common, public areas of the building. I did not take Mr. King into 850 Bryant Street through the public areas in the front entrance of 850 Bryant due to my concern that he could be seen by, or see, people from his neighborhood who might wonder why he was freely in the company of Homicide Inspectors. Similarly, I was concerned that if Mr. King saw certain individuals he might decide not to speak to us any longer.
> Once in the interview room, we uncuffed Mr. King. *At no time, either at the McDonald's or in transition to the interview room or in the*

6

> *interview room prior to the recording being turned on did we discuss the shotgun with Mr. King or interview him in any way.*

This is the record on what occurred before the video. There is no evidence that the police began interviewing Mr. King before they were seated in the interrogation room. Defense counsel states, "[i]t seems apparent from the context that the officers had already been speaking to Mr. King prior to turning on the video." It is unclear what "context" counsel is referring to. It is undisputed that the inspectors had spoken to Mr. King by phone earlier in the day and at the McDonald's, and had also walked with him up to the room, but there is no evidence that police began the *interview* with Mr. King prior to what can be seen on the video.

Consequently, an evidentiary hearing is not required to resolve this motion. A district court "ordinarily is required [to hold an evidentiary hearing] if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the [confession] are in issue." *United States v. Walczak*, 783 F.2d 852, 857 (9th Cir. 1986) (citation omitted). Defense counsel argues that it is disputed (1) "whether Mr. King was advised that he was free to leave," and (2) "whether any interrogation preceded the *Miranda* warning." *First*, the communications in the interrogation room can be seen accurately in the video. *Second*, the record is empty as to any self-incriminating statements made before the interview. Defendant is in a position to state from memory — after all he was there — what occurred before being seated in the interview room. If he earlier confessed to something about the shotgun he could tell us what it was. The police have no record of such a statement. That defendant has vagued out on this speaks volumes.

Defense counsel characterizes the statements in the defendant's declaration as indicating that questions were asked before the interrogation room was reached. But that is not accurate. The declaration: *one*, stated King was handcuffed; *two*, drew a mere legal conclusion that King was "in custody"; and *three*, re-characterized what can be viewed on the video. Defendant never flatly stated he was interviewed at the stationhouse before the interview on the video commenced. Again, he ought to know what happened. He was there. The desire for a fishing expedition does not create a material issue of fact. Thus, an evidentiary hearing is not warranted.

7

At the hearing, defense counsel stated that King could not be precise about what happened before the video because he has not seen the video, he just has his memory. Again, this does not create cause for an evidentiary hearing. King can and should state the fact and content of something that was said before he and police got to the interrogation room, if that is his claim. Otherwise, we are left with a declaration from Inspector Engler saying nothing happened and sheer conjecture from defense counsel.

**2.    PRE-WARNING STATEMENTS WERE NOT THE RESULT OF INTERROGATION**

"The prosecution bears the burden of proving, at least by a preponderance of the evidence, the *Miranda* waiver . . . and the voluntariness of the confession." *Seibert*, 542 U.S. at 608 n.1. Defendant solely argues that there was no *Miranda* waiver as to the pre-warning statements by Mr. King, and thus that those and post-warning statements are inadmissible under *Seibert*. Under *Miranda* and its progeny, once suspects are in custody, police officers cannot interrogate them without first advising them of their rights and obtaining a waiver. As defendant does not argue that he did not waive his rights once the warnings were given, his argument hinges on whether his pre-warning statements were the result of custodial interrogation.

"Voluntary statements are not considered the product of interrogation. The term 'interrogation' means 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response.'" *United States v. Washington*, 462 F.3d 1124, 1132 (9th Cir. 2006) (citing *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980)).

Defendant argues that he was not advised that he was "free to leave" and thus his pre-warning statements were custodial. As repeated above, the police inspectors expressed in various ways that Mr. King did not have to speak with them, and King acknowledged that he understood and wanted to speak with them. Defendant cites no authority that required police to use the literal phrase "free to leave."

For the sake of argument, this order assumes that Mr. King was in custody during the entire interview. Even so, *his pre-warning statement was not the result of interrogation* and is so far removed from the evil at stake in *Seibert* that suppression is not warranted. There was no

8

confession here. It is hard to even characterize it as questions and answers. The inspectors were reviewing the topics they were going to cover with King. By contrast, the evil at issue in *Seibert* was a genuine question-and-answer situation without advisement followed by *Miranda* followed by interrogation during which "a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again." 542 U.S. at 613.

In our case it would have been easy for King to back off of his pre-warning statements. The declarations reviewed above and the exact dialogue on the video show that the police inspectors were trying to list the general topics they wanted to cover in detail in the interview with Mr. King. They were not even asking him questions. They were advising him of the upcoming topics to be covered. *Compare United States v. Padilla*, 387 F.3d 1087, 1093 (9th Cir. 2004) (where defendant was induced to talk).

Defense counsel argues that the pre-warning statements were incriminating specifically because defendant responded "mm-hmm" in between the items to be covered in the interview, as follows:

| | |
|---|---|
| Inspector Engler: | Okay. So earlier we did a couple things. Another place that you lived was your mom's place. |
| King: | Mm-hmm. |
| Inspector Engler: | Okay, and in the downstairs, your mom pointed out there's a bedroom there and a bedroom there and you stay in there when you're around and your brother stays in the other room when he's around. |
| King: | Mm-hmm. |

At the hearing, Attorney Blank stated that defendant did not say "mm-hmm" but rather "yes." The Court went back and checked and Attorney Blank is incorrect. The utterance was "mm-hmm."

This passage was innocuous. It said nothing about a shotgun. It surely said nothing more than King already knew they knew. Most of all, the supposedly pre-warning incriminating statement — "mm-hmm" — was not a response to a question. It was an interjection between

9

1 items on the list to be covered. It was ambiguous; the "mm-hmm" could have meant any of the
2 following:

3     Interpretation No. 1:    I understand what you're saying;

4     Interpretation No. 2:    I agree that my mom pointed these things out; or

5     Interpretation No. 3:    I agree that it's a true statement that I stay in one of the
6     rooms in my mom's basement.

7 King's "mm-hmm" was an imprecise and innocuous statement that pales in comparison to what
8 he later admitted. Later, he admitted the following: "I got a gun from Ted. I always wanted it,
9 because of the way it looked. . . . I brought it home and threw it under the bed. My bed is at 78
10 Edgar Place in the basement." Defendant could have easily slid off his "mm-hmm," given its
11 multiple meanings, and avoided a confession after having been Mirandized.

12 **3.** ***SEIBERT* AND *WILLIAMS* DO NOT REQUIRE SUPPRESSION OF THE INTERVIEW**

13     Defense counsel argues in briefing that the interrogation-room interview should be
14 suppressed because "[police] did not [advise Mr. King of his *Miranda* rights] until after several
15 minutes of custodial questioning elicited a verbal confession by Mr. King *regarding the shotgun*"
16 (emphasis added). This is wrong. Counsel *repeatedly* misstates the evidence to this effect (*see*
17 Br. 1, 2, 7, 9, 11, 12). *There were no questions or answers regarding a shotgun prior to the*
18 *Miranda warnings.*

19     Counsel cites no decisions that suppress a confession based on facts that are even remotely
20 close to the facts of this case. Defendant recounts the *Seibert* decision and emphasizes that the
21 two-stage interrogation at issue therein was a widespread police practice. But that is not what
22 happened here. *There was no two-step interrogation in this case*. In reply, defendant argues that
23 his pre-warning acknowledgment of where he lived is akin to confessing ownership of the
24 shotgun. These are obviously not the same thing. And, as shown, the "mm-hmm" was highly
25 ambiguous.

26     Under *Williams*, "where law enforcement officers *deliberately* employ a two-step
27 interrogation to obtain a confession and where separations of time and circumstance and
28 additional curative warnings are absent or fail to apprise a *reasonable person* in the suspect's

10

shoes of his rights, the trial court should suppress the confession." 435 F.3d at 1158 (emphasis in original). To determine deliberateness, "courts should consider whether objective evidence and any available subjective evidence, such as an officer's testimony, support an inference that the two-step interrogation procedure was used to undermine the *Miranda* warning." *Ibid.*

This order need not reach the issue of deliberateness because the "mm-hmm" response by defendant was so far removed from what he eventually admitted (after being Mirandized) that the basic evil at which *Seibert* and *Williams* are aimed is not present in our case at hand.

## CONCLUSION

For the foregoing reasons, defendant's motion to suppress is **DENIED**.

**IT IS SO ORDERED.**

Dated: October 21, 2010.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE