1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

        Plaintiff,

  v.

MARCEL DARON KING,

        Defendant.

                        /

No. C 10-00455 WHA

**ORDER DENYING MOTION TO SUPPRESS FRUITS OF SEARCH OF 78 EDGAR PLACE**

**INTRODUCTION**

      Defendant has moved to suppress the fruits of the search of 78 Edgar Place in San Francisco.  The parties dispute (1) whether defendant's mother gave consent to the search, and (2) whether the police officers who conducted the search needed and had reasonable suspicion to search the house pursuant to a warrantless search condition of defendant's probation.  This order finds that the police officers had reasonable suspicion that defendant had shot Shawnte Sparks and thus conducted a valid probation search.  It therefore does not reach the consent issue. Accordingly, the motion is **DENIED**.

**STATEMENT**

      The location of the search in question is the home of defendant's mother, Veronica Bradford.  Both sides agree that defendant sometimes stayed in one of the rooms in the house.  On the morning of May 10, 2010, Inspector Joseph Engler was investigating the shooting of Shawnte

**United States District Court**
For the Northern District of California

1   Sparks, which had just occurred.[1]  He got a tip that defendant Marcel King was the shooter.  He,

2   along with other police officers, went to defendant's mother's house.  Defendant's mother and

3   father were there, but he was not.  The officers searched defendant's room and found a shotgun.

4   Defendant is charged here with being a felon in possession of a firearm.  Defendant's motion

5   argues that the fruits of the officers' search of 78 Edgar Place should be suppressed because they

6   conducted a warrantless search not within any exception to the warrant requirement.

7          Accompanying his motion, defendant submitted a declaration from Ms. Bradford stating

8   that she never gave consent to a search (Dkt. No. 38).  In contrast, accompanying the

9   government's opposition to the motion was a declaration of Inspector Engler, in which he stated:

10  "[W]e asked [Ms. Bradford] whether we could search the room where Mr. King stayed. . . . Ms.

11  Bradford[] gave verbal consent for a search of the home" (Dkt. No. 43).  Also submitted was a

12  consent-to-search form and a property receipt form, both purportedly signed by Ms. Bradford

13  (Dkt. Nos. 38-1 and 38-2).  The government argues that she signed both forms immediately after

14  the search of defendant's room; defense counsel argues that she only signed the property receipt

15  at that time, and that she never signed the consent-to-search form.  The record also includes

16  Inspector Engler's police report, which states: "Inspectors Engler and Delahunty contacted . . .

17  Bradford-King . . . at the front door of 78 Edgar Street, San Francisco, Ca. 94112. [] Ms.

18  Bradford-King consented to a search of her home . . ." (Dkt. No. 37-1).

19         At the time of the search, defendant was subject to a term of probation that stated:

20  "Defendant is subject to a warrantless search condition, as to defendant's person, property,

21  premises and vehicle, any time of the day or night, with or without probable cause, by any peace,

22  parole or probation officer" (Dkt. No. 37-2).

23         Given the discrepancies of fact in the record, an evidentiary hearing was held on

24  November 23, 2010.  Supplemental briefing was subsequently received and reviewed.

25

26

27

28
      ---------------------------------
              [1] Joseph Engler worked for the San Francisco Police Department as an Inspector during the time in
      question.  He has since been promoted to Lieutenant.  He will be referred to throughout this order as Inspector
      Engler.

                                          2

**United States District Court**
For the Northern District of California

**ANALYSIS**

The police officers in this case had no warrant to search Ms. Bradford's residence. "Evidence recovered following an illegal entry of the home is inadmissible and must be suppressed." *United States v. Shaibu*, 920 F.2d 1423, 1425 (9th Cir. 1990) (citation omitted). "Any exception to the Fourth Amendment warrant requirement must be proven by a preponderance of evidence, and this burden is upon the government." *United States v. Linn*, 880 F.2d 209, 214 (9th Cir. 1989). The parties address two potential exceptions to the warrant requirement: a consent search and a probation search. Consideration of whether the search was a valid probation search is dispositive.

As an initial matter, the parties dispute the amount of suspicion that police officers must have before they search the residence of a *probationer*, as opposed to a *parolee*. The government asserts that *Samson v. California*, 547 U.S. 843 (2006), which held that police may conduct *suspicionless* searches of *parolees*, requires a mirror holding for probationers. It is not yet settled whether our court of appeals will extend the *Samson* rule to probationers or instead will distinguish them from parolees in this context. But it is clearly the case that police officers need "no more than reasonable suspicion" of criminal activity by a probationer to search his or her residence without a warrant. *United States v. Knights*, 534 U.S. 112, 121 (2001). Police officers must also have probable cause that the *place* they are searching is a residence of the probationer. *United States v. Franklin*, 603 F.3d 652, 656 (9th Cir. 2010). Defense counsel agrees that the police officers had probable cause that the searched room was defendant's room (Supp. Br. 4). Because this order finds that the officers had at least reasonable suspicion that Mr. King had killed Shawnte Sparks, it need not determine whether some lesser amount of suspicion was actually required.[2]

---

[2] The parties briefly discuss a recent order of this Court: *United States v. O'Neal*, No. CR 10-00275 WHA, 2010 WL 4010123 (N.D. Cal. Oct. 13, 2010). That order stated: "The Fourth Amendment allows officers to search a probationer's residence without a warrant upon reasonable suspicion of a probation violation." *Id.* at *3 (citing *Knights*, 534 U.S. at 121-22). In that case, however, the dispute did not focus on whether the police officers had reasonable suspicion — or some lesser or greater amount of suspicion — that the defendant had possessed cocaine base. Instead, the focus was on whether the officers had probable cause that the motel room they searched was a residence of the defendant. The parties did not discuss the implication of *Samson* to a finding that there was sufficient suspicion that the defendant had possessed cocaine base. In

United States District Court

For the Northern District of California

While probable cause means "a fair probability that contraband or evidence of a crime will be found," reasonable suspicion is merely a particularized and objective basis for suspecting criminal activity. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). Though defense counsel certainly contested it in argument, that the police officers had reasonable suspicion of criminal activity by defendant was not really contested in evidence. This order holds that Inspector Engler had reasonable suspicion.

What follows are findings made by the Court after an evidentiary hearing. On the morning of May 10, 2010, Inspector Joseph Engler was investigating the shooting of Shawnte Sparks, which had just occurred. He testified at the evidentiary hearing:

> I was standing out there [at the crime scene]. It was early morning hours; middle of the night. And there was very, very, very little traffic, and very few people on the street. And I observed the person you refer to as "CW 1." . . . I observed this person on a street corner, watching the activities. And it was peculiar, because this person was very intent on watching what we were doing. So I — I walked over, and introduced myself as the investigator, and that was how I first came into contact with CW 1.

(Tr. 13.) CW1 "had a family relationship to the victim." He had never been an informant for the SFPD. CW1 did not seek any benefit for providing information to Inspector Engler. In fact, for the first 20 to 25 minutes of their contact, CW1 cried and Inspector Engler tried to console CW1. (Tr. 13–14.) CW1 was also concerned because CW1 "was from a large, established family in San Francisco, with many relations on their side. And CW 1 had information suggesting who was involved with the homicide as a shooter, who also has a large extended San Francisco family." The concern was that if CW1 cooperated with police, members of the shooter's family could retaliate against members of CW1's family. (Tr. 14–15.)

Nevertheless, CW1 shared information with Inspector Engler. After the shooting had occurred, "CW 1 began receiving phone calls that the victim had been shot, and information about a description of how it went down, and who may have done it" (Tr. 15). CW1 had not been present at the scene of the crime. Instead, CW1 got information over the phone from someone referred to as "Moniker." Moniker had been present at the scene of the crime, but had not

---

fact, that order found that there was at least reasonable suspicion that he had possessed cocaine base. The statement quoted was broader than necessary to decide the case.

actually seen the shooting.  Moniker, in turn, had gotten information about the identity of the shooter from a third individual, CW2, who *had* apparently seen the shooting directly.  (Tr. 15–17.)  Inspector Engler was familiar with Moniker and CW2 from prior experience (Tr. 18–19).

Therefore, in part, CW1 was relaying information from Moniker who was in turn relaying information from CW2.  But Inspector Engler was also able to get information directly from Moniker.  Here's how: While standing there with Inspector Engler, CW1 called Moniker on his or her cell phone, and held the phone up while on speakerphone so that Engler could hear the conversation, but at no point told Moniker that a police officer was listening.  During this conversation, Moniker said "I was out there," and "[CW2] saw it," and proceeded to describe the scene and incident as seen by CW2.  Moniker described the shooter as follows:

- His name was Marcel;

- He was a fat, dark-skinned "N —" with dreadlocks; and

- He was pictured on the cover of a "Bread Me Out" album, which was "a rap album out of a group in Hunters Point."

(Tr. 17–22.)  CW1 knew who this "Marcel" was, and also conveyed to Inspector Engler that he knew that there had been an incident a few weeks before in which Marcel and the victim, Shawnte Sparks, had gotten into an altercation over one of their son's jackets (Tr. 23).

CW1 knew where "Marcel" had grown up, but did not know the address, so Inspector Engler and CW1 went to the house, which was thereby determined to be 1526 Hudson Street (Tr. 24).  Then Inspector Engler went back to the police stationhouse, conducted a Google search for "Bread Me Out," and found pictures of album covers with "young African-American men" on them.  He got on the phone with CW1, who was also at a computer, and directed CW1 to the same website.  Inspector Engler asked: "That person that you said lived at 1526 Hudson Street Marcel [sic] — is th[at] any of the people on the front cover?"  CW1 indicated which of the men was "Marcel."  (Tr. 25–27.)

Next, Inspector Engler and his partner did a computer inquiry — presumably in the police database — "pulling all past calls for service, and anything associated with 1526 Hudson Street that could come up with the name 'Marcel.'"  Their search yielded an individual named Marcel King.  They compared a mug shot of Marcel King against the picture of the individual identified

United States District Court
For the Northern District of California

5

as "Marcel" on the cover of the "Bread Me Out" album by CW1, and "noted it looked like the same person." (Tr. 29.) That is the same person as the defendant herein (Tr. 30). Marcel King was on probation and subject to a warrantless search condition, which again stated: "Defendant is subject to a warrantless search condition, as to defendant's person, property, premises and vehicle, any time of the day or night, with or without probable cause, by any peace, parole or probation officer" (Dkt. No. 37-2). The residence he had listed with probation was 1526 Hudson Street (Tr. 32). The police officers went and searched that house. It was defendant's grandmother's house. Defendant's grandmother told Inspector Engler that in fact defendant stayed at his mother's house, which she identified as 78 Edgar Place. (Tr. 33.) The officers then went to 78 Edgar Place and searched defendant's room.

The evidence that Inspector Engler had reasonable suspicion was clear and credible. This order so finds. Inspector Engler had a solid tip that defendant was the shooter of Shawnte Sparks. It certainly created a reasonable suspicion that defendant had committed the homicide.

Nevertheless, defense counsel argues that the government did not elicit sufficient testimony to carry its burden on the point that the tips from CW1 were reliable. Both parties point to the standards set forth in *United States v. Rowland*, 464 F.3d 899, 907–09 (9th Cir. 2006) (citations and quotation marks omitted):

> While the probable cause requirement for a warrant requires a fair probability that contraband or evidence of a crime will be found, reasonable suspicion is less demanding and can arise from information that is less reliable than that required to show probable cause. Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors — quantity and quality — are considered in the totality of the circumstances. Thus, if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable.
>
> Courts look to several factors to determine the reliability of an informant's tip. First, a known informant's tip is thought to be more reliable than an anonymous informant's tip. That is because an anonymous informant typically cannot be questioned about the basis for knowing the information or motive for providing the tip, nor can the anonymous informant be held accountable for providing false information in violation of the law. Second, an informant with a proven track record of reliability is considered more reliable than an unproven informant. Third, the informant's tip is considered more reliable if the informant reveals the basis of knowledge of the tip — how the informant came to know the information. Finally, a tip that provides detailed predictive information about future events that is corroborated by police observation may be considered reliable, even if the tip comes from an anonymous source. Predictive information

United States District Court

For the Northern District of California

> that reveals a detailed knowledge of an individual's intimate affairs is more reliable than predictive information that could be observed by the general public, and such self-verifying detail is considerably more valuable if it relates to suspicious activities than if it relates to innocent activities.

Moreover, as probable cause may be found based on hearsay from informants, *see United States v. Angulo-Lopez*, 791 F.2d 1394, 1397 (9th Cir. 1986), and *Hart v. Parks*, 450 F.3d 1059, 1066 (9th Cir. 2006), reasonable suspicion may be found based on hearsay as well.

Here, although Inspector Engler met with CW1 personally, he did not meet with Moniker or CW2 personally. Again, Moniker and CW2 did not know of Inspector Engler's involvement. It is difficult to determine CW1's motive to give a true or false tip to the police. On one hand, CW1 was a family member of the victim, so that points toward pointing the finger at the real culprit. On the other hand, the history of family feuds discussed by Inspector Engler weighs toward wanting to implicate a Hatfield, if CW1 was a McCoy.

CW1 based much of the information relayed to Engler on statements from Moniker — but that information was also heard directly from Moniker when Inspector Engler listened in on the speakerphone. This order finds the underlying information from Moniker and CW2 about the identity of the shooter was made more reliable because of the history of dealings between the individuals involved in conveying the information eventually received by Inspector Engler. Also, given that the phone call was fresh — in the immediate aftermath of the homicide — it was made more reliable. Like an excited utterance, Moniker's statements had indicia of being close in feeling, and hence accurate, to the events that occurred that night.

Moreover, this order finds that much of the information gathered by Inspector Engler after he received the tip about the identity of the shooter, but before the search, corroborated the tip's reliability. CW1 knew "Marcel" and described a recent altercation between "Marcel" and the victim. CW1 knew where "Marcel" grew up and showed that house to Inspector Engler. The address of that house matched the address provided by Marcel King as a part of his being on probation. Most importantly, Marcel King's mug shot matched the picture on the album cover of "Marcel" the shooter. That similarity corroborates not only information from CW1, but also information from Moniker, who named the album cover in the first place. This order finds that "[t]he informant in this case provided sufficient detail to dispel concerns that the tip was a hoax."

7

1     *Rowland*, 464 F.3d at 908.  Inspector Engler had a particularized and objective basis for

2     suspecting that defendant had shot Shawnte Sparks.

3          This order thus holds that the totality of the circumstances provides "specific and

4     articulable facts which, taken together with rational inferences from those facts, reasonably

5     warrant[ed]" the probation search of 78 Edgar Place.  *Id.* at 909.  The police officers had at least a

6     reasonable suspicion that Marcel King had shot Shawnte Sparks.  This holding is dispositive, so

7     this order need not reach the issue of whether there was valid consent to the search.

**CONCLUSION**

9          The warrantless search of 78 Edgar Place on May 10, 2010, was constitutional as a

10    probation search.  For the foregoing reasons, defendant's motion is **DENIED**.

12         **IT IS SO ORDERED.**

14    Dated:  January 3, 2011.

      HON. WILLIAM ALSUP
      UNITED STATES DISTRICT JUDGE